1
2
3
4
5
6
7
8                   UNITED STATES DISTRICT COURT
9             FOR THE EASTERN DISTRICT OF CALIFORNIA
10
11   JESSICA GLYNN,                        No. 2:15-cv-00529-KJM-CKD (TEMP)
12              Plaintiff,                 ORDER
13        v.
14   CITY OF STOCKTON,
15              Defendant.
16
17
18            Jessica Glynn alleges her former employer, the City of Stockton, discharged her
19   because of her pregnancy and because she reported violations of the Fair Labor Standards Act
20   (FLSA) and U.S. Constitution. The City disagrees, and moves for summary judgment. The court
21   held a hearing on July 1, 2016. Nancy McCoy appeared for Glynn, and Marciana Arredondo
22   appeared for the City. The motion is granted in part.
23   I.       PROCEDURAL BACKGROUND
24            Glynn filed a complaint in this court in March 2015, which she amended with the
25   court's permission in May 2016. *See* Order, ECF No. 21; First Am. Compl., ECF No. 22. The
26   amended complaint remains operative. Glynn asserts five claims against the City of Stockton:
27   (1) gender and pregnancy discrimination in violation of Title VII of the Civil Rights Act of 1964,
28   42 U.S.C. § 2000e-2(a)(1); (2) an essentially identical discrimination claim under the California

                                              1

1  Fair Employment and Housing Act (FEHA), Cal. Gov't Code § 12940(a); (3) failure to prevent

2  discrimination under the FEHA, Cal. Gov't Code § 12940(k); (4) unlawful retaliation for

3  reporting violations of the FLSA, 29 U.S.C. § 215(a)(3); and (5) unlawful retaliation for reporting

4  constitutional and labor violations under California Labor Code section 1102.5. *See* First Am.

5  Compl. at 6–11.

6       The City moved for summary judgment on May 11, 2016. ECF No. 23. Glynn

7  opposed the motion, ECF No. 35, and the City replied, ECF No. 36.

8  **II.    EVIDENTIARY OBJECTIONS**

9       The City objects to many of the record citations Glynn submitted in support of her

10  opposition brief. *See generally* Def.'s Resp. Pl.'s Stmt. Disp. Facts (Resp. Stmt.), ECF Nos. 36-1

11  and 36-2. In recent years, many judges in this district, including the undersigned, have cautioned

12  litigants against terse and reflexive objections at summary judgment, especially when the objector

13  is the moving party. *See, e.g.*, *Lindell v. Synthes USA*, ___ F. Supp. 3d ___, 2016 WL 70305, at *2

14  (E.D. Cal. Jan. 6, 2016); *U.S. E.E.O.C. v. Placer ARC*, 114 F. Supp. 3d 1048, 1052–53 (E.D. Cal.

15  2015); *Hanger Prosthetics & Orthotics, Inc. v. Capstone Orthopedic, Inc.*, 556 F. Supp. 2d 1122,

16  1126 n.1 (E.D. Cal. 2008); *Burch v. Regents of Univ. of Cal.*, 433 F. Supp. 2d 1110, 1119 (E.D.

17  Cal. 2006). Counsel may find these orders useful for future reference.

18       The admissibility of evidence at trial is governed by different rules and different

19  motivations than at summary judgment. Whereas the full panoply of the Federal Rules governs

20  evidence presented to a jury at trial, at summary judgment, Federal Rule of Civil Procedure 56

21  provides that a party may raise objections if "the material cited to support or dispute a fact cannot

22  be presented in a form that would be admissible in evidence." Fed. R. Civ. P. 56(c)(2). As this

23  language suggests, at summary judgment propriety depends not on form, but on content. *Celotex*

24  *Corp. v. Catrett*, 477 U.S. 317, 324 (1986); *Block v. City of L.A.*, 253 F.3d 410, 418–19 (9th Cir.

25  2001). Thus, for example, on review of summary judgment, the Ninth Circuit has considered the

26  hearsay contents of a diary whose substance would have been admissible in another form at trial.

27  *See Fraser v. Goodale*, 342 F.3d 1032, 1037 (9th Cir. 2003). Similarly, if evidence lacks full-

28  fledged authenticity or foundation at summary judgment, it may yet warrant consideration if

1   "substantive evidence could be made use of at trial." *Portnoy v. City of Davis*, 663 F. Supp. 2d

2   949, 953 (E.D. Cal. 2009) (citing *Fraser*, 342 F.3d at 1036) (quotation marks omitted).

3          Relevance, vagueness, speculation, and similar objections are a particularly poor

4   fit for summary judgment because the court may simply disregard irrelevant or indecipherable

5   evidence. *See, e.g.*, *Burch*, 433 F. Supp. 2d at 1119. Likewise, an objection that a statement is

6   argumentative or mischaracterizes the record either requests a credibility determination unsuited

7   for summary judgment or would better be directed at the underlying evidence itself. *See, e.g.*,

8   *Stonefire Grill, Inc. v. FGF Brands, Inc.*, 987 F. Supp. 2d 1023, 1034 (C.D. Cal. 2013).

9          The City's objections fall into two categories: relevance and hearsay. *See, e.g.*,

10   Resp. Stmt. nos. 86–90. None is supported by argument, and only one citation follows each

11   objection: the corresponding federal rule. *See, e.g.*, *id.* no. 86 ("Objection. Inadmissible as

12   hearsay. Fed. R. Evid. 801, 802."). These objections are overruled. First, the evidence considered

13   in this order is relevant, and objections to other evidence are moot. Second, the City's hearsay

14   objections do not fit the evidence they confront. Many of these objections target statements that

15   are not hearsay. *See, e.g.*, *id.* no. 91 (a supervisor gives advice about a media appearance); *cf.*

16   Fed. R. Evid. 801(d)(2) (excluding from hearsay the statements of a party opponent). Other

17   objections target statements unlikely to be offered to prove the truth of any underlying factual

18   assertion. *See, e.g.*, Resp. Stmt. no. 92 (the same supervisor makes an unflattering comparison

19   between his wife and the plaintiff); *cf* Fed. R. Evid. 801(c)(2) (a statement is hearsay if it is

20   offered "to prove the truth of the matter asserted in the statement"). The remaining statements are

21   admissible in some other form at trial. *See, e.g.*, Resp. Stmt. no. 103 (an employee said she has

22   experience in a particular grant application process); *cf.* Fed. R. Evid. 602 (a witness may testify

23   about her own personal knowledge).

24   **III.   FACTUAL BACKGROUND**

25          When considering a motion for summary judgment, the court relies on whatever

26   facts are undisputed and otherwise considers the evidentiary record in the light most favorable to

27   the party opposing the motion. *See, e.g.*, *A.G. v. Paradise Valley Unified Sch. Dist. No. 69*, 815

28

1  F.3d 1195, 1202 (9th Cir. 2016). In this case that procedure sets up the following factual

2  background.

3       **A.**       **The Office of Violence Prevention Manager**

4            This case concerns Jessica Glynn's former employment in Stockton's Office of

5  Violence Prevention (OVP). As its name suggests, the OVP works to prevent and reduce violence

6  and crime in the City. *See* First Am. Compl. ¶ 9, ECF No. 22; Answer ¶ 9, ECF No. 27; Wilson

7  Decl. ¶ 3, ECF No. 23-8. In short, OVP staff works with local community organizations to reach

8  Stockton youth and young adults who are at greatest risk of violence. *See* Wilson Decl. Ex. A,

9  at 1, ECF No. 23-8. In 2014, the City approved the creation of a position to oversee the OVP, the

10  OVP Manager. *Id.* Among other responsibilities, the OVP Manager would direct the work of the

11  OVP's staff; ensure the OVP operated within City policy and any applicable state and federal law;

12  monitor legislation and relevant legal developments; coordinate efforts between the OVP and

13  other City agencies, law enforcement, and the public; oversee private and public fundraising

14  efforts; and generally monitor the OVP's budget and expenditures. *Id.* The OVP Manager would

15  report to the City Manager's Office. *Id.*

16            In mid-2014, the City created a job description, *see id.*, and set out to hire an OVP

17  manager, Wilson Dep. 23. Several dozen candidates applied, and more than a dozen applications

18  were forwarded to the City Manager, Kurt Wilson. Wilson Dep. at 24–25. Together, Wilson and

19  the Chief of Police reviewed these applications and selected a handful of finalists. *Id.* at 25–26.

20  Two panels of City employees interviewed the finalists, among whom was the plaintiff, Jessica

21  Glynn, an attorney. *Id.* at 33–35. The interviewers had some concerns about Glynn's

22  qualifications, but in general their impression of her was favorable. *See id.* at 34–40. In the end,

23  Wilson concluded Glynn was the most qualified among the candidates the City interviewed. *Id.*

24  at 42. He later described her as a "particularly qualified candidate" with a "unique combination of

25  management and academic skills." Wilson Dep. Ex. 15. On September 25, 2014, after a final

26  interview, Wilson offered her the job. *Id.* at 58, 62–65 & Ex. 14.

27            Glynn received an offer letter the day after her interview. *See* Clegg Decl. ¶ 2,

28  ECF No. 23-9; Wilson Decl. Ex. D, ECF No. 23-8. She met with Christian Clegg, the Assistant to

1   the City Manager, for a few hours on October 8, 2014 "to start planning out OVP" and to sign her

2   offer letter. Glynn Dep. 152–53. At the end of this meeting, after signing the letter, she told Clegg

3   she was pregnant. *Id.* at 153–55. He was surprised and told her that for him, "family comes first."

4   *Id.* at 153–54. He said that his wife was an attorney like Glynn, but that she stayed at home with

5   their children because taking care of children is a full-time job. *Id.* at 153–54, 56. In Glynn's

6   memory, it was an awkward exchange. *Id.* at 155. Clegg explains that he had intended to

7   communicate the City's support for her well-being, i.e., that her family would come first. Clegg

8   Dep. 305–06. He repeated this statement—"family comes first"—several times during her

9   employment with the City. Glynn Dep. 156–57.

10        On October 10, 2014, Glynn received a letter confirming her appointment as OVP

11   Manager. Glynn Decl. ¶ 50 & Ex. O, ECF No. 32. October 16, 2014 was her first full day on the

12   job. *Id.* ¶ 6. Clegg was her direct supervisor, and Wilson was Clegg's superior. Wilson Decl. ¶ 7.

13   Glynn's subordinates, in order of rank, were the OVP Program Specialist, the Outreach

14   Coordinator, and five Outreach Workers. *Id.*

15       **B.**     **Compliance with the Fair Labor Standards Act**

16        On Glynn's first full day as OVP Manager, Glynn Decl. ¶ 60, Wilson wanted to

17   meet with her that day, but he was too busy. Glynn Decl. Ex. U; Clegg Dep. 59. The office was

18   closed on Friday, so on Monday, Glynn arranged a meeting with Wilson for Tuesday, October 21.

19   *See* Glynn Decl. ¶ 6 & Ex. U; Clegg Dep. 58.

20        Glynn's duties as OVP Manager included ensuring FLSA compliance. Clegg Dep.

21   274. Before her Tuesday meeting, Glynn became concerned that the City's compensation policies

22   for its outreach workers violated the FLSA. *See* Glynn Decl. ¶ 62 & Ex. V. Glynn asked to meet

23   with someone from the City's Human Resources department about these concerns, and a meeting

24   was scheduled for October 27, 2014 with the City's Assistant HR Director and the City Attorney.

25   *Id.* ¶¶ 62, 64.

26        A few minutes after scheduling her meeting with HR and the City Attorney, Glynn

27   met with Wilson and Clegg, as she had arranged the day before. *Id.* ¶ 63. She told them about her

28   concerns and her upcoming October 27 meeting, and she said, "I may have just saved you a wage

1    and hour lawsuit." *Id.* Clegg and Wilson understood her comment as a proposed justification for a

2    raise and promotion, *see* Clegg Decl. ¶ 2; Clegg Dep. 58–59; Wilson Decl. ¶ 12, but Glynn did

3    not intend her comment this way, Glynn Decl. ¶ 63. They thought she meant to ask for a

4    promotion because in the same meeting, she revisited concerns she had raised earlier about her

5    title and compensation: Before she signed her offer letter, she had asked Clegg and Wilson about

6    whether the OVP Manager position was akin to that of a director. Glynn Dep. 259. To her mind,

7    the job description resembled that of standalone director-level positions she had seen in other

8    cities—positions generally independent of a city manager's oversight or control—and she was

9    curious or concerned why the City had decided its OVP Manager would report to the City

10   Manager's Office. *Id.* at 258–60. This difference also meant she would receive a lower salary. *See*

11   *id.* In response, Clegg explained the City Manager wanted to play a role in the OVP's work and

12   development. *Id.* at 260. Clegg said they would wait and "see how it develops" in response to

13   Glynn's concerns about her title and pay. *Id.* at 260–61.

14          This exchange, misunderstanding or not, caused tension between Clegg and Glynn

15   for several weeks, and he became concerned about their working relationship. Clegg Decl. ¶ 3;

16   Clegg Dep. 60. Wilson also immediately second-guessed his decision to hire Glynn after their

17   meeting on October 21. Wilson Decl. ¶ 12.

18          As planned, Glynn met with HR and a City Attorney on October 27 to discuss the

19   City's compensation policies.[1] Glynn Decl. ¶ 64. She remained convinced the City's policies

20   violated the FLSA, and again brought the matter to Clegg's attention. *Id.* ¶ 65. He dismissed her

21   concerns as an overreaction. *Id.* Glynn nevertheless told her subordinates in the OVP about their

22   rights under the FLSA and attempted to avoid compliance problems by monitoring their

23   timekeeping. *Id.* ¶¶ 66–67; *see also* Praegitzer 30(b)(6) Dep. at 40–41. She brought these same

24   FLSA concerns to Clegg's attention again in later conversations, but he admonished her for

25   _____

26   [1] This meeting included City Attorney Marciana Arredondo, the same attorney who
     represented the City in conjunction with this motion. *See* Glynn Decl. ¶ 64. It appears Ms.

27   Arredondo may be called as a witness at trial. The court need not address that possibility in this
     order, but refers the parties to California Rule of Professional Conduct 5-210 and Rule 3.7 of the

28   American Bar Association's Model Rules.

1    talking to her subordinates about their timekeeping and again said she was overreacting. *Id.*

2    ¶¶ 68–69.

3              C.    **Glynn's Concerns About Due Process Violations**

4              Soon after Glynn started, she was alarmed by meetings that officers of the

5    Stockton Police Department and OVP's outreach workers had been holding every other week.

6    Glynn Dep. 104, 117, 124–25; *see also* Praegitzer 30(b)(6) Dep. at 38–39; Praegitzer Dep. at 55;

7    Clegg Dep. 288; Gomez Dep. 77. The purpose of these meetings was to allow police detectives

8    and outreach workers to "share information." Glynn Dep. at 104–05. In actual practice, however,

9    police detectives used the meetings to gather information from the outreach workers about

10   Stockton residents who were OVP's clients. *See id.* Experts from an outside organization, the

11   California Partnership for Safe Communities, were surprised to hear from Glynn that the City

12   held these meetings, as was Trevor Womack, a Stockton Deputy Police Chief. *Id.* at 105, 107–09.

13   Womack believed conversations between line officers and outreach workers would be

14   counterproductive, because the Police Department had no interest in cultivating the perception

15   that it used outreach workers as informants. *See* Womack Dep. 22, 52–53.

16            Glynn concluded the information meetings risked violations of OVP's client's due

17   process rights and increased the probability of an investigation by the U.S. Department of Justice.

18   Glynn Dep. 110, 150–52; Womack Dep. 53–54. She ended the meetings. Glynn Dep. 125. She

19   expressed her concerns to Clegg, who said she was blowing any constitutional exposure out of

20   proportion. *Id.* at 127; Clegg Dep. 287–90. In his view she had called for unnecessarily urgent

21   action. Clegg Dep. at 291–92. He said she was behaving overdramatically and asked her

22   subordinates whether they had concerns about her work. Glynn Dep. 131–33.

23            Glynn also brought up her concerns in a meeting with representatives of the City

24   Manager's Office, the City Attorney's Office, and the Police Department. *See* Womack Dep. 51–

25   54. The group listened to Glynn's concerns, which she explained in terms of the Fourth and Fifth

26   Amendments, and discussed how those concerns could be addressed. *Id.* at 53–54. They decided

27   that if police or prosecutors wanted to use information obtained from an outreach worker, that

28   worker would act as a witness like any other rather than pass tips to police informally as a

1   confidential informant. *Id.* at 54. Glynn revisited the issue frequently in conversations with staff

2   because some outreach workers had a habit of giving tips to police without her knowing. *See*

3   Glynn Dep. 145.

4       **D.**    **Perceived Sexism and Hostility**

5           As noted above, throughout Glynn's employment with the City, Clegg told her that

6   for him, "family comes first," Clegg Dep. 305; Glynn Dep. 156–57, 159, often in the context of

7   her anticipated maternity leave, Glynn Dep. 158–59. The phrase "family comes first" became

8   more offensive to her as time went on; she came to believe that "there was more to it" or that his

9   words had a "deeper meaning" than simply underscoring the importance of one's family. *See id.*

10   at 157–60. Glynn also inferred from Clegg's Mormon faith, which he volunteered at one point,

11   that his statement "took on more of a meaning." *Id.* at 188. In her complaint, she alleges he

12   believed a woman's place was at home, not at work, and thought she was not putting her family

13   first. First Am. Compl. ¶ 11, ECF No. 22.

14           Clegg made other comments Glynn found condescending and sexist. He told her

15   that she was overdramatic, that she overreacted, and that she was too hasty. Glynn Dep. 90, 161.

16   Before Glynn's first media interview, in response to her request for advice, Clegg said she should

17   not be "so confident." *Id.* at 161–64. He "shut down" her requests to talk about sexism in the

18   office. *Id.* at 204–05. He compared her to his wife, whom he described as forceful and dramatic,

19   and said that he hoped he and Glynn could learn to get along like he and his wife had done over

20   the course of their marriage. *Id.* at 90–91.

21       **E.**    **Glynn's Performance and the Decision to End her Employment**

22           The City and Glynn offer conflicting evidence about her performance as OVP

23   Manager. Her work received positive reviews from the City's consultants and members of the

24   Stockton community, who reported a "positive working relationship" with her, Clegg Dep. 343;

25   were glad the City had hired her, S. Lam Dep. 40; were happy she took time to come meet them,

26   *id.*; and described her as "very professional," Ashgar Dep. 11–12. In particular, the "People And

27   Congregations Together" or "PACT" organization was "very positively impressed with her

28   knowledge and vision for the new Office of Violence Prevention" and was "impressed by her

1    eagerness to get out of City Hall and listen and work with community leaders." Glynn Decl.

2    Ex. M, at JG 77. PACT believed "[s]he was doing much to repair the alienation and tension that

3    exists in various communities in regards to city government and policing." *Id.* Later, after Glynn

4    was terminated, PACT publicly expressed its disapproval of the decision. *See generally id.*

5          The record also includes evidence that OVP and City staff were frustrated with

6    Glynn's performance. For example, one of her subordinates wrote a memo to Clegg in late

7    January 2015 to disclose his disapproval of Glynn's work. *See* Gomez Dep. 149–51 & Ex. 37. He

8    wrote that Glynn had made poor management decisions and had created a hostile and unstable

9    work environment. *Id.* Ex. 37 at 1. He also claimed she had snubbed an important Hispanic

10   community leader, weakened the relationship between OVP and law enforcement by canceling

11   the regular information meetings between officers and outreach workers, caused OVP employees

12   to consider resignation, valued the advice of inexperienced employees over veterans, changed

13   dates and deadlines without notice, collapsed under pressure, and was easily manipulated. *Id.*

14   at 2–4.  He recommended that she "complete supervisor's training." *Id.* at 4; Gomez Dep. at 293.

15   He did not expect she would be fired. Gomez Dep. at 292.

16         The same City employee described an emotional and chaotic OVP staff meeting in

17   November 2014. Gomez Dep. Ex. 37, at 1–2. Before the meeting, Glynn had spoken to an

18   outreach worker about a potential promotion. Constantino Decl. ¶¶ 2–3, ECF No. 23-5; Glynn

19   Dep. 281–83. She told him she would need to speak with a few more people before her decision

20   was finalized, but did not dissuade him from telling his wife the good news. Constantino Decl.

21   ¶ 4; Glynn Dep. 283. Later, however, she concluded this employee was not qualified to be a

22   supervisor because he had made racist comments about other OVP staff. *See* Glynn Dep. 284–85,

23   287. Glynn told her staff she would accept applications from all. Constantino Decl. ¶ 6. And in a

24   staff meeting on November 20, 2014, she said the position had been put on hold. *Id.* ¶ 7; Glynn

25   Dep. 285–86. In the same meeting, an outreach worker complained that he felt pressure from

26   others within OVP to feed information about his clients to the police, and Glynn announced she

27   was ending meetings between outreach workers and detectives. *See* Glynn Dep. 285–86. Some of

28   the staff began to argue, and Glynn decided she would need to find a mediator to address

9

1  longstanding personal and possible racial animus in the OVP, lest the outreach workers' bad

2  relationships put one another in danger on the job. *Id.* at 287–88. Similarly, another OVP staffer

3  testified in deposition that the OVP had a history of personal rivalries that predated Glynn's

4  employment. *See* Praegitzer Dep. 20–21, 25–28.

5        The parties dispute other aspects of Glynn's alleged poor performance and whether

6  Clegg and Wilson weighed one or another specific failure when they began to consider

7  termination. *See generally*, *e.g.*, Resp. Stmt. nos. 15–23 (whether Glynn missed a deadline to

8  apply for a grant worth between $200,000 and $250,000); *id.* nos. 41–45 (whether Glynn caused

9  friction by protesting Clegg's decision to hire OVP staff without consulting her); *id.* nos. 56–75

10  (whether Glynn's management decisions pressured a subordinate into premature retirement,

11  contrary to Clegg's and Wilson's wishes); *id.* nos. 76–81 (whether Glynn was disorganized and

12  unprepared for an important meeting). Relating the specifics of these episodes would likely

13  double the length of this order. At this stage it suffices to say that a finder of fact could rationally

14  agree with either party's proposed interpretations of the evidence.

15        Clegg and Wilson began to consider Glynn's termination in January 2015,

16  approximately three months after she started. Clegg Dep. 430. Clegg brought his concerns to

17  Wilson's attention in mid-January, and the two weighed their options over the next few weeks. *Id.*

18  at 430–31. Eventually, in early February, Clegg came to the conclusion that Glynn was not a

19  "good fit" for the position. *Id.* at 435–36. He thought she could not accept direction, was abrasive,

20  lacked judgment, and could not make deliberate and thoughtful decisions. *Id.* at 442.

21        Clegg decided on Friday, February 5, 2015, that he would recommend Glynn's

22  termination. Clegg Dep. 427–28. He gave Wilson a written summary of his conclusions, and

23  Wilson said he wanted to think about it over the weekend. *Id.* at 437. The next week, on Monday

24  or Tuesday, Wilson agreed with Clegg that Glynn was not a good fit and that she did not interact

25  well with elected officials, the community, law enforcement personnel, and others. *Id.* at 438–39.

26  Clegg contacted HR. *Id.* at 439–40. Glynn was discharged on February 13, 2015. Wilson Decl.

27  Ex. D, at 2. The letter informing her of her termination was delivered to her personally on that

28  day, and it informed her that the City's decision "was based upon an incompatible management

10

style." *Id.* She was more than eight months pregnant at the time. Glynn Dep. 281. In a meeting

with OVP staff soon afterward, Clegg said Glynn had moved on to spend time with her family,

and that they would be reporting to him. Gomez Dep. 291. He said again, "For me, family comes

first." Youn Decl. ¶ 5, ECF No. 34. He did not disclose that Glynn had been fired or why. Gomez

Dep. at 292.

        Clegg never gave Glynn a written evaluation of her work. Clegg Dep. 486. He

never imposed discipline on her. *Id.* He never warned her that her job was at risk. *Id.* Glynn

asserts that she never received a written performance evaluation or formal warning, was never

provided with a probationary period, and never heard substantive comments on her performance,

formally or informally. Glynn Decl. ¶¶ 40–41. She claims that during her informal, day-to-day

conversations with Clegg, he never said her work performance was poor or her job was in

jeopardy. *Id.* ¶ 42.

## IV.    LEGAL STANDARD

        A motion for summary judgment will be granted "if the movant shows there is no

genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."

Fed. R. Civ. P. 56(a). In response to a motion for summary judgment, the court undertakes a

"threshold inquiry" into whether a trial is necessary at all, that is, whether "any genuine factual

issues . . . properly can be resolved only by a finder of fact because they may reasonably be

resolved in favor of either party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986). The

court does not weigh evidence or assess the credibility of witnesses; rather, it determines which

facts the parties do not dispute and draws all inferences and views all evidence in the light most

favorable to the nonmoving party. *See id.* at 255; *Matsushita Elec. Indus. Co. v. Zenith Radio

Corp.*, 475 U.S. 574, 587–88 (1986). "Where the record taken as a whole could not lead a rational

trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'" *Matsushita*,

475 U.S. at 587 (quoting *First Nat'l Bank of Ariz. v. Cities Serv. Co.*, 391 U.S. 253, 289 (1968)).

        The moving party bears the initial burden of "informing the district court of the

basis for its motion, and identifying those portions of [the record] which it believes demonstrate

the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323

1    (1986). If the party opposing summary judgment would bear the burden of proof at trial, the

2    moving party need only illustrate the "absence of evidence to support the non-moving party's

3    case." *In re Oracle Corp. Sec. Litig.*, 627 F.3d 376, 387 (9th Cir. 2010). The burden then shifts to

4    the nonmoving party to "go beyond the pleadings" and "designate specific facts showing that

5    there is a genuine issue for trial." *Celotex*, 477 U.S. at 324 (quotation marks omitted). The non-

6    moving party "must do more than simply show that there is some metaphysical doubt as to the

7    material facts." *Matsushita*, 475 U.S. at 586. "Only disputes over facts that might affect the

8    outcome of the suit under the governing law will properly preclude the entry of summary

9    judgment." *Anderson*, 477 U.S. at 247–48.

10   **V.    DISCUSSION**

11          As noted above, Glynn advances the following claims: sex discrimination under

12   Title VII and the FEHA, failure to prevent discrimination, and unlawful retaliation in violation of

13   the FLSA and Labor Code section 1102.5. The City moves for summary judgment on each claim.

14   The motion is granted on Glynn's FLSA retaliation claim and on her claim for failure to prevent

15   discrimination, and otherwise the motion is denied.

16         **A.    Sex Discrimination**

17                **1.    Discrimination Claims in General and Direct Evidence**

18          Under both federal and California law, an employer may not discharge an

19   employee because of her sex. 42 U.S.C. § 2000e-2(a)(1); Cal. Gov't Code § 12940(a). With

20   respect to Title VII, the words "because of sex" encompass the meaning "because of or on the

21   basis of pregnancy, childbirth, or related medical conditions." 42 U.S.C. § 2000e(k). Likewise,

22   with respect to the FEHA, the definition of "sex" includes "[p]regnancy or medical conditions

23   related to pregnancy" and "[c]hildbirth or medical conditions related to childbirth." Cal. Gov't

24   Code § 12926(r)(1). *See also Newport News Shipbuilding & Dry Dock Co. v. E.E.O.C.*, 462 U.S.

25   669, 670 (1983); *Harris v. City of Santa Monica*, 56 Cal. 4th 203, 214 (2013).

26          At summary judgment, claims of sex discrimination are typically evaluated with

27   the help of the three-step process described by the Supreme Court in *McDonnell Douglas Corp. v.*

28   *Green*, 411 U.S. 792 (1973). The plaintiff must first present a *prima facie* case of discrimination

1    by showing that she belongs to the applicable protected group, that she was performing according

2    to her employer's legitimate expectations, that she was discharged, and that the discharge was

3    discriminatory. *See, e.g.*, *Godwin v. Hunt Wesson, Inc.*, 150 F.3d 1217, 1220 (9th Cir. 1998).

4    Second, the employer may respond by producing evidence to show the employee was discharged

5    for some legitimate, nondiscriminatory reason. *Id.* And third, the employee may avoid summary

6    judgment by producing evidence to show the employer's explanation was pretext, and that its true

7    motivation was discriminatory. *Id.*

8             Glynn cites what she characterizes as direct evidence of discrimination: Clegg's

9    explanation that "family comes first." *See* Opp'n at 3–4. Sometimes direct evidence of

10   discrimination obviates the *McDonnell Douglas* process, but Supreme Court and Ninth Circuit

11   decisions offer confusing guidance in this respect. In some cases, those courts have explained that

12   the *McDonnell Douglas* test is inapplicable to discrimination claims supported by direct evidence

13   of discrimination, as that test was conceived in an effort to allow the prosecution of

14   discrimination claims based on only circumstantial evidence. *See Trans World Airlines, Inc. v.*

15   *Thurston*, 469 U.S. 111, 121 (1985) (an airline's transfer policy was facially discriminatory on the

16   basis of age under the Age Discrimination in Employment Act); *Cmty. House, Inc. v. City of*

17   *Boise*, 490 F.3d 1041, 1049 (9th Cir. 2007) (*McDonnell Douglas* does not apply to a facially

18   discriminatory housing policy under the Fair Housing Act).

19            In other decisions, the Ninth Circuit has explained that direct evidence of

20   discrimination may satisfy a plaintiff's *prima facie* burden in the first step of *McDonnell Douglas*.

21   *See, e.g.*, *Cordova v. State Farm Ins. Cos.*, 124 F.3d 1145, 1148 (9th Cir. 1997) (citing *Int'l Bhd.*

22   *of Teamsters v. United States*, 431 U.S. 324, 358 (1977)); *accord Vasquez v. Cty. of Los Angeles*,

23   349 F.3d 634, 640 (9th Cir. 2003) ("For a *prima facie* case, [the plaintiff] must offer evidence that

24   gives rise to an inference of unlawful discrimination, either through the framework set forth in

25   *McDonnell Douglas Corp. v. Green* or with direct or circumstantial evidence of discriminatory

26   intent." (citations, alterations, quotation marks, and footnotes omitted)).

27            In a third group of decisions, the Ninth Circuit has considered direct evidence of

28   discrimination when deciding whether the defendants' explanations were pretext for

1  discrimination, i.e., at the third *McDonnell Douglas* step. *See, e.g.*, *Coghlan v. Am. Seafoods Co.*

2  *LLC*, 413 F.3d 1090, 1094–95 (9th Cir. 2005); *Dominguez-Curry v. Nev. Transp. Dep't*, 424 F.3d

3  1027, 1038 (9th Cir. 2005); *Chuang v. Univ. of Cal. Davis, Bd. of Trs.*, 225 F.3d 1115, 1127 (9th

4  Cir. 2000); *Godwin v. Hunt Wesson, Inc.*, 150 F.3d 1217, 1220–21 (9th Cir. 1998). Similarly, the

5  Supreme Court has explained that a plaintiff's burden at the third *McDonnell Douglas* step

6  "merges with [her] ultimate burden of persuading the court that she has been the victim of

7  intentional discrimination," and may be met by relying on either direct or circumstantial evidence.

8  *Texas Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 256 (1981).

9    Finally, the Ninth Circuit recently advised that when a plaintiff presents "both

10  some direct evidence and some circumstantial evidence, it is most appropriate to consider the

11  propriety of summary judgment under the *McDonnell Douglas* framework." *France v. Johnson*,

12  795 F.3d 1170, 1173 (9th Cir. 2015) (citing *Shelley v. Geren*, 666 F.3d 599, 607 (9th Cir. 2012),

13  and *Enlow v. Salem-Keizer Yellow Cab Co.*, 389 F.3d 802, 812 (9th Cir. 2004)).

14    It may be possible to reconcile these authorities, but the exercise is unnecessary in

15  this case, as the motion cannot be granted even if the evidence is considered circumstantial. The

16  court therefore explains its reasoning within the *McDonnell Douglas* framework. Glynn's

17  proposed direct evidence may be addressed in the context of her burden to prove pretext. In

18  addition, because California and federal employment discrimination law resemble one another,

19  California courts look to federal decisions when interpreting FEHA and have expressly adopted

20  the burden-shifting test of *McDonnell Douglas*. *Guz v. Bechtel Nat'l Inc.*, 24 Cal. 4th 317, 354

21  (2000). Glynn's FEHA and Title VII claims are therefore addressed jointly here.

   **2.**  **Glynn's *Prima Facie* Case and the City's Explanation**

23    Ms. Glynn alleges she was fired despite her satisfactory job performance because

24  her supervisor believed women should not work after becoming mothers, but should stay home

25  and take care of their children. A plaintiff's *prima facie* burden is not onerous. *See Burdine*, 450

26  U.S. at 253. This burden primarily serves to rule out "the most common nondiscriminatory

27  reasons" for an employer's decision. *Id.* at 254. Here the parties agree Glynn is a member of the

28  relevant protected class and was terminated. In addition, the evidence here, viewed in the light

most favorable to Glynn's position, shows she performed her job adequately and was terminated in discriminatory circumstances: she was hired after a competitive process and never received a negative performance review; OVP's consultants and community leaders praised her; she was never informed her job was at risk; Clegg often referred to his "family first" philosophy, which may reasonably be interpreted as a preference that women with children not work outside the home; she was terminated a matter of weeks before her pregnancy was full-term; and Clegg made other remarks, summarized above, which a reasonable juror could construe as sexist.

In response, the City has cited testimony that Glynn was fired because she was not performing her duties to her supervisors' satisfaction, and as noted above, a rational trier of fact could credit its explanations. *See id.* ("It is sufficient if the defendant's evidence raises a genuine issue of fact as to whether it discriminated against the plaintiff."). Glynn does not argue otherwise. *See* Opp'n at 6. The question is therefore whether the City's explanations are pretext for discrimination.

### 3.      Pretext for Discrimination

As noted above, evidence of pretext may be either direct or circumstantial. *See id.* at 256. Direct evidence of discrimination may prevent summary judgment even if it is not substantial. *Dominguez-Curry*, 424 F.3d at 1038. Circumstantial evidence, by contrast, must be specific and substantial. *See Godwin*, 150 F.3d at 1221 (collecting authority). It must call into question the credibility of the employer's explanation. *Burdine*, 450 U.S. at 256; *Vasquez*, 349 F.3d at 642.

"Direct evidence is evidence which, if believed, proves the fact of discriminatory animus without inference or presumption." *Coghlan*, 413 F.3d at 1095 (citation, alterations, and quotation marks omitted). An employer's clearly racist and sexist statements or actions are the archetype. *See id.* For example, in *Godwin v. Hunt Wesson, Inc.*, the Ninth Circuit found direct evidence of discrimination in a supervisor's statement that he "did not want to deal with another female," 150 F.3d at 1221, and in *Cordova v. State Farm Insurance Companies*, the plaintiff cited his employer's description of him as a "dumb Mexican," 124 F.3d at 1148–49. The Ninth Circuit

1   has "repeatedly held that a single discriminatory comment by a plaintiff's supervisor" prevents

2   summary judgment in the employer's favor. *Dominguez-Curry,* 424 F.3d at 1039.

3          "Stray remarks," however, are not direct evidence of discrimination. *France*, 795

4   F.3d at 1173. A coworker's sexist comments are usually not direct evidence of the employer's

5   discrimination. *See, e.g.*, *Noga v. Costco Wholesale Corp.*, 583 F. Supp. 2d 1245, 1257 (D. Or.

6   2008). Neither are ambiguous statements of preference, such as approval of "fresh faces," *Cozzi v.*

7   *Cty. of Marin*, 787 F. Supp. 2d 1047, 1059 (N.D. Cal. 2011), or a "bright young man," *Merrick v.*

8   *Farmers Ins. Group*, 892 F.2d 1434, 1438–39 (9th Cir. 1990). Likewise courts have found that

9   isolated comments, unconnected to any adverse action, are not direct evidence of discrimination.

10  *Nesbit v. Pepsico*, 994 F.2d 703, 705 (9th Cir. 1993).

11         Here, Clegg's words are not direct evidence of sexism. They were ambiguous,

12  stray remarks. His "family first" comments may reasonably be characterized as either an

13  expression of support for Glynn's well-being or they may imply he thought it better for her to stay

14  home. Similarly, sexism could reasonably be inferred from his assessment of Glynn as

15  overdramatic, abrasive, overconfident, and hasty—and his expression of hope that she would

16  someday conform to the standard set by his reportedly similarly overdramatic, stay-at-home wife.

17  The necessity of an inference means his comments are only circumstantial evidence of

18  discrimination. After all, men and women alike can jump to conclusions and act without thinking.

19         Glynn has, however, produced additional evidence to show the explanations for

20  her termination were pretext. She has cast doubt on many of the City's purported justifications:

21         •   Glynn's termination letter refers to her "incompatible management style,"

22             but the City now explains its decision largely by citing (1) its

23             dissatisfaction with her substantive work and (2) what Clegg and Wilson

24             believed was her premature request for a raise and promotion. *See* Mem. P.

25             & A. at 2–7.

26         •   Clegg and Wilson never confronted Glynn with their concerns, never

27             expressed their frustrations to her in a performance review, never offered

28

her an opportunity to correct her mistakes, and never disciplined her. Clegg Dep. 486; Glynn Decl. ¶¶ 40–42.

- Drawing inferences in Glynn's favor, the tension at a staff meeting in November 2014 was mostly attributable to factors independent of her managerial missteps. *See, e.g.*, Glynn Dep. 282–88 (OVP staff was divided by racial and personal animus); Praegitzer Dep. at 20–21, 25–28 (the outreach workers had difficult working relationships).

- A long-time staffer's retirement was not as clearly attributable to Glynn's poor leadership as the City suggests, but arose from personal and family concerns. *See, e.g.*, Praegitzer Dep. 6 (leaving for personal reasons); Praegitzer 30(b)(6) Dep. 20–21 (leaving to pay attention to family concerns, including a brother's recent death).

- Although the City argues it was motivated by Glynn's failure to obtain a valuable grant, no one told her the grant was a reason for her termination, her termination letter did not mention the grant or grants in general, and it was not clear she was responsible for the particular deadline, *see* Glynn Decl. ¶ 36; Glynn Dep. 299–300; Duer Dep. 29–31, 34.

- Although the City claims Glynn flubbed an important meeting just before she was fired, she counters with written praise of her performance from a source outside the City's offices. Glynn Decl. ¶ 56 & Ex. S. In addition, Clegg concluded he would recommend her termination before this meeting took place. *See id.*; Clegg Dep. 428.

- Finally, as noted above, Clegg's interactions with Glynn circumstantially suggest Glynn's gender and pregnancy motivated his decision to recommend her termination. The evidence here also suggests that Clegg withheld the reason for her departure from OVP staff and instead told them she had decided to leave so she could be with her family. She was terminated soon before her due date.

17

1        The City also argues the termination could not have been discrimination because

2  the person who decided to fire Glynn was the same person who had hired her a few months

3  before. When the same person hires and fires an employee within a relatively short time period,

4  usually within a year or two, a "strong inference" of non-discrimination arises. *Schechner v.*

5  *KPIX-TV*, 686 F.3d 1018, 1026 (9th Cir. 2012). This inference, commonly referred to as the

6  "same actor" inference, is neither a mandatory presumption nor merely a reasonable conclusion

7  for the jury to draw; summary judgment may be granted as a result of its application. *See Bradley*

8  *v. Harcourt, Brace & Co.*, 104 F.3d 267, 270–71 (9th Cir. 1996). If the "same actor" inference

9  applies, only a "strong case of bias" will allow the case to proceed to trial. *See Coghlan*, 413 F.3d

10  at 1098. A plaintiff may also overcome this inference if she can show circumstances changed

11  during the time of her employment. *See, e.g.*, *id.* at 1097 (suggesting the inference could be

12  overcome with evidence that a supervisor had become biased over time).

13        Here, Glynn was fired within four months of her first full day on the job, but the

14  situation calls for a more nuanced description than the City offers. As for the hiring decision, the

15  evidence points directly to Wilson: he decided to offer her the job the same day he interviewed

16  her. By contrast, the decision to end Glynn's employment is most directly attributable to Clegg.

17  But even assuming both decisions were made by Wilson and Clegg together, a "strong inference"

18  of nondiscrimination would not stand. Contrary to the City's assertions, Glynn did not reveal her

19  pregnancy until after Wilson had decided she was his pick for OVP Manager. Combined with the

20  evidence cited above, this discrepancy suffices to rebut the "same actor" inference.

21        The circumstances of this case also show how an employer may be liable for the

22  discriminatory actions of an individual supervisor.[2] "[I]f a supervisor performs an act motivated

23

24        [2] This theory of liability is commonly labeled the "cat's paw" theory. As explained by the
Supreme Court,

25

26        The term "cat's paw" derives from a fable conceived by Aesop, put into verse by
        La Fontaine in 1679, and injected into United States employment discrimination

27        law by Posner in 1990. In the fable, a monkey induces a cat by flattery to extract
        roasting chestnuts from the fire. After the cat has done so, burning its paws in the
        process, the monkey makes off with the chestnuts and leaves the cat with nothing.

28        A coda to the fable (relevant only marginally, if at all, to employment law)

1 by [discriminatory] animus that is *intended* by the supervisor to cause an adverse employment

2 action, and if the act is a proximate cause of the ultimate employment action, then the employer is

3 liable . . . ." *Staub*, 562 U.S. at 422 (emphasis in original; footnote omitted) (applying this theory

4 to an antidiscrimination provision of the United Services Employment and Reemployment Rights

5 Act). Here the evidence could allow a jury to conclude that Clegg meant to terminate Glynn's

6 employment because of her sex and pregnancy. A jury could likewise understand that Wilson's

7 agreement to her discharge came about by Clegg's intervention.

8       Finally, the City also points out that Glynn was employed on an at-will basis. She

9 disagrees, but the dispute is immaterial. An employee's at-will employment status is no defense to

10 a charge of discriminatory termination. *E.E.O.C. v. Cal. Psychiatric Transitions, Inc.*, 725 F.

11 Supp. 2d 1100, 1118 (E.D. Cal. 2010) (citing *Freund v. Nycomed Amersham*, 347 F.3d 752, 758

12 (9th Cir. 2003)).

13       In summary, because Glynn has responded to the City's motion with evidence that

14 shows its nondiscriminatory explanations for firing her are "unworthy of credence," *Burdine*, 450

15 U.S. at 256, the motion is denied with respect to the claims for sex discrimination in violation of

16 Title VII and the FEHA.

17     **B.**    **Failure to Prevent Discrimination**

18       Glynn's opposition brief does not address the City's motion on this claim. At

19 hearing, plaintiff's counsel acknowledged this omission. Counsel argued only that in total, the

20 statement of disputed and undisputed facts attached to Glynn's opposition would allow a trial.

21 Counsel did not refer to specific facts, and suggested only that a jury could agree discrimination

22 occurred. A plaintiff who claims her employer failed to prevent discrimination must prove more

23 than that discrimination occurred. *See, e.g.*, *Alamo v. Practice Mgmt. Info. Corp.*, 219 Cal. App.

24 4th 466, 474, 479–80 (2013) (citing CACI No. 2527, which requires the plaintiff prove, among

25

26       observes that the cat is similar to princes who, flattered by the king, perform
services on the king's behalf and receive no reward.

27 *Staub v. Proctor Hosp.*, 562 U.S. 411, 415 n.1, (2011) (citing *Shager v. Upjohn Co.*, 913 F.2d
398, 405 (7th Cir. 1990) (Posner, J.)). In the context of employment litigation, the fable serves as

28 a cautionary tale to employers against the rubberstamping of a supervisor's recommendations.

1   other things, that her employer "failed to take all reasonable steps to prevent" discrimination").

2   The court has no duty to "comb the record to find some reason to deny a motion for summary

3   judgment." *Carmen v. S.F. Unified Sch. Dist.*, 237 F.3d 1026, 1029 (9th Cir. 2001) (citation and

4   quotation marks omitted); *see also* Status (Pretrial Scheduling) Order at 4, ECF No. 10 (warning

5   that failure to oppose a motion may be deemed consent to the motion; citing *Brydges v. Lewis*,

6   18 F.3d 651, 652–53 (9th Cir. 1994) (per curiam) ("[B]ecause [the plaintiff] was warned of the

7   consequence of his failure to respond to the appellees' summary judgment motion, the district

8   court did not err by deeming his failure to respond a consent to the motion for summary

9   judgment.")). The motion is therefore granted on this claim.

10        **C.**     **Retaliation in Violation of the FLSA**

11        Glynn alleges the City discharged her in retaliation for her reports of FLSA

12   violations. An employer may not discharge an employee because she "filed any complaint" about

13   an FLSA violation. 29 U.S.C. § 215(a)(3). A "complaint" may be "filed" both orally or in writing,

14   *Kasten v. Saint-Gobain Performance Plastics Corp.*, 563 U.S. 1, 14 (2011), with either a regulator

15   or the employer itself, *Lambert v. Ackerley*, 180 F.3d 997, 1007 (9th Cir. 1999) (en banc). The

16   complaint must have been at least a substantial motivating factor in the employee's termination, if

17   not its but-for cause. *Avila v. Los Angeles Police Dep't*, 758 F.3d 1096, 1100–01 & n.3 (9th Cir.

18   2014).

19        An employer must have "fair notice" that an employee's complaint implicates the

20   FLSA's antiretaliation provisions. *Kasten*, 563 U.S. at 13; *Rosenfeld v. GlobalTranz Enters., Inc.*,

21   811 F.3d 282, 286 (9th Cir. 2015). In other words, "not all amorphous expressions of discontent

22   related to wages and hours constitute complaints." *Lambert*, 180 F.3d at 1008. "To fall within the

23   scope of the antiretaliation provision, a complaint must be sufficiently clear and detailed for a

24   reasonable employer to understand it, in light of both content and context, as an assertion of rights

25   protected by the statute and a call for their protection." *Kasten*, 563 U.S. at 14. The Ninth Circuit

26   recently applied a gloss on this "fair notice" rule for purposes of summary judgment: Could a

27   reasonable jury find that the plaintiff's advocacy "reached the requisite degree of formality" so

28    

1     that her actions were a protected activity? *Rosenfeld*, 811 F.3d at 288; *accord Kasten*, 563 U.S. at

2     14 ("[T]he phrase 'filed any complaint' contemplates some degree of formality . . . .").

3             The complaining employee's role is one prominent aspect of the alleged

4     complaint's context. *Rosenfeld*, 811 F.3d at 286. For example, an employer is more likely to

5     understand it has received a "complaint" when a newly hired, entry-level employee reports

6     underpayment. *Id.* The employer is far less likely to believe it has received a complaint, all other

7     things being equal, if the reporting person is a manager tasked with the company's FLSA

8     compliance. *Id.* In this second scenario, an employer may very well understand the manager's

9     purported "complaint" as an employee doing her job. *Id.* Applying these rules in *Rosenfeld*, the

10    Ninth Circuit held that the plaintiff, who was a manager of human resources, had "filed a

11    complaint" because "ensuring compliance with the FLSA was *not* [her] responsibility." *Id.*

12    (emphasis in original). Rather, her boss "considered himself solely responsible for FLSA

13    compliance and did not understand, appreciate, or welcome [the plaintiff's] bringing to his

14    attention the FLSA violations." *Id.*

15            Turning again to this case, there is no dispute that the City terminated Glynn's

16    employment. The next question is whether Glynn made a "complaint": were her reports

17    "sufficiently clear and detailed" so that a reasonable employer should have understood them, "in

18    light of both content and context, as an assertion of rights protected by the statute and a call for

19    their protection"? *Kasten*, 563 U.S. at 14. The City unpersuasively dismisses Glynn's reports as

20    unfocused inquiries. A jury could reasonably find that Glynn had more than general questions

21    about the City's pay practices. She told the City's HR department, its attorney, and her supervisor

22    that she believed outreach workers were not receiving the compensation they were due and

23    explained in particular what violations she believed had occurred. The City had enough detail,

24    and Glynn did more than ask questions.

25            This case resembles *Rosenfeld* in these respects. "Critically," however, unlike the

26    plaintiff in *Rosenfeld*, 811 F.3d at 288, Glynn's duties included assuring "operations were

27    performed in accordance with . . . . applicable state and federal laws," and the City told OVP

28    Manager applicants it required knowledge of "[a]pplicable federal, state, and local laws, rules,

and regulations," Wilson Decl. Ex. A. Unlike in *Rosenfeld*, the record here suggests Glynn had a duty to monitor OVP's compliance with the FLSA, and Wilson and Clegg intended for her to do so. Glynn's report to Clegg and Wilson also shows that she was attempting to protect the City from a lawsuit, not that she was protesting or complaining about a deprivation of rights: "I may have just saved you a wage and hour lawsuit," she told them. Glynn Decl. ¶ 63. Although Clegg thought her reports were alarmist overreactions, he did not tell her the FLSA was none of her concern. It is undisputed that Clegg thought her duties included FLSA compliance. UMF no. 34. After she brought up her concerns, she "continued to monitor" her staff's timekeeping. Glynn Decl. ¶ 67. In opposition to the City's motion, she describes FLSA compliance as a budgetary and liability matter, not as an issue of workers' rights. *See id.* ¶¶ 64, 68.

The only reasonable conclusion one may draw from this evidence is that both Glynn and the City thought she was doing her job when she reported FLSA violations, not that she was lodging a "complaint." Another district court recently distinguished *Rosenfeld* on a similar basis. *See Phelps v. City of Parma*, No. 14-0085, 2016 WL 1275593, at *10–13 (D. Idaho Mar. 31, 2016). Summary judgment is granted on this claim.

### D.   Retaliation in Violation of California Labor Code § 1102.5

Ms. Glynn also alleges her termination violates California Labor Code section 1102.5(b). Under that subparagraph,

> An employer . . . shall not retaliate against an employee for disclosing information . . . to a person with authority over the employee or another employee who has the authority to investigate, discover, or correct the violation or noncompliance, . . . regardless of whether disclosing the information is part of the employee's job duties.

Cal. Lab. Code § 1102.5(b).

Section 1102.5(b) is meant to encourage workplace whistleblowers to report suspected violations of law without fear of retaliation. *Soukup v. Law Offices of Herbert Hafif*, 39 Cal. 4th 260, 287 (2006). An employee who asserts a claim under section 1102.5(b) must prove that she engaged in a protected activity, that she suffered an adverse employment action,

1   and that a causal link connects her protected activity with the adverse employment action. *Id.*

2   at 287–88.

3           These provisions resemble the FLSA provisions discussed in the previous section

4   with two exceptions that prove dispositive. First, although the FLSA's antiretaliation provision

5   applies only to violations of the FLSA, Labor Code section 1102.5(b) applies to any suspected

6   "violation of state or federal statute, or a violation of or noncompliance with a local, state, or

7   federal rule or regulation," Cal. Lab. Code § 1102.5(b), including suspected constitutional

8   violations, *see, e.g.*, *Mize-Kurzman v. Marin Cmty. Coll. Dist.*, 202 Cal. App. 4th 832, 850 (2012)

9   (requiring an employee's "reasonable suspicion that a violation of a constitutional, statutory, or

10   regulatory provision has occurred" (citation and quotation marks omitted)). Second, section

11   1102.5(b) applies "regardless of whether disclosing the information is part of the employee's job

12   duties." Cal. Lab. Code § 1102.5(b).

13           Here Glynn alleges she reported violations of the FLSA and U.S. Constitution and

14   was terminated because of her reports. If proven, these allegations would establish the City's

15   liability. The City does not dispute Glynn was terminated, but argues for summary judgment on

16   two bases. First, as above, it interprets the evidence here to show that Glynn raised only general

17   questions about possible violations of the FLSA and "due process" rights. But the evidence here

18   would allow a reasonable jury to find that Glynn raised specific concerns that (1) the City's pay

19   philosophy violated the FLSA, and (2) regular meetings between police officers and outreach

20   workers violated City residents' Fourth and Fifth Amendment rights, including their rights to due

21   process of law. She did not merely inquire whether these concerns were valid, but asserted that

22   the City faced liability and halted the meetings.

23           Second, the City argues that Glynn was discharged not because of her reports, but

24   because of her incompetence. An employee's reports must be the cause of her termination.

25   *Ferrick v. Santa Clara Univ.*, 231 Cal. App. 4th 1337, 1357 (2014). On this record a jury could

26   conclude that Glynn was terminated because of her reports. Clegg more than once expressed

27   frustration that she overreacted, he admonished her for keeping tabs on her staff's timesheets, and

28   her termination came soon after a subordinate complained about her decision to end the meetings

between police and outreach workers. *See* Gomez Dep. Ex. 37, at 2. In addition, as discussed with respect to Glynn's claims for sex discrimination, the City's explanations of her incompetence are vulnerable to evidence they were pretext. The motion is denied as to this claim.

**VI.     CONCLUSION**

        The motion is **granted** with respect to claims three (failure to prevent discrimination under the FEHA) and four (retaliation in violation of the FLSA). The motion is **denied** with respect to claims one (sex discrimination in violation of Title VII), two (sex discrimination in violation of the FEHA), and five (retaliation in violation of section 1102.5). This order resolves ECF No. 23.

        IT IS SO ORDERED.

DATED:  July 25, 2016.

UNITED STATES DISTRICT JUDGE